UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

CITIZENS OPPOSING NORTHERN　　　}
ALABAMA PIPELINE PROJECT,　　　　}
WILD ALABAMA, and GASP　　　　　}
COALITION,　　　　　　　　　　　}
　　　　　　　　　　　　　　　　　}
　　　　Plaintiffs,　　　　　　　　　}
　　　　　　　　　　　　　　　　　}　　CASE NO. CV 99-B-0097-NE
v.　　　　　　　　　　　　　　　　}
　　　　　　　　　　　　　　　　　}
UNITED STATES FISH AND　　　　　}
WILDLIFE SERVICE; SAM　　　　　　}
HAMILTON, Regional Director of the　}
U.S. Fish and Wildlife Service, and　　}　　**ENTERED**
TUCKER STONE, Manager, Wheeler　}
National Wildlife Refuge; and　　　　}　　MAR 3 0 2000
SOUTHERN NATURAL GAS　　　　　}
COMPANY,　　　　　　　　　　　　}
　　　　　　　　　　　　　　　　　}
　　　　Defendants.　　　　　　　　}

**MEMORANDUM OPINION**

Currently before the court is plaintiffs' Motion for Preliminary Injunction.[1] Plaintiffs seek the issuance of a preliminary injunction against the defendants alleging that the defendant U.S. Fish and Wildlife Service ("FWS"): (Count One) completed an inadequate environmental assessment ("EA") as part of its required National Environmental Policy Act ("NEPA") review of the defendant Southern Natural Gas Company's ("SONAT") project; (Count Two) failed to follow FWS established policy for corridor utilization within the Wheeler National Wildlife Refuge ("Refuge"); and (Count Three) violated the Endangered Species Act ("ESA") and the

---

[1] Plaintiffs originally filed a Motion for Temporary Restraining Order. However, by agreement of the parties, the court will treat the Motion for Temporary Restraining Order as a Motion for Preliminary Injunction.

Administrative Procedure Act ("APA") in granting a FWS permit ("Permit") to SONAT to cross under the Refuge. Plaintiffs seek to enjoin Southern Natural Gas Company's use of its U.S. Fish and Wildlife Service Permit to construct a natural gas pipeline under the Wheeler Wildlife Refuge. After consideration of the record, the submissions of the parties, the testimony of witnesses, and the relevant law, the court is of the opinion that plaintiffs' Motion is due to be denied.

## I. BACKGROUND

The dispute among the parties arises from SONAT's desire to construct a 122- mile natural gas pipeline from Tuscaloosa, Alabama to the northern Alabama cities of Decatur and Huntsville. The route requires the crossing of the Tennessee River at some point. The Federal Energy Regulatory Commission ("FERC") has the authority to determine the public convenience and necessity for such new pipeline systems and the routes those systems are to follow. In this instance, the authorized route crossed the Refuge, utilizing a corridor near the existing Interstate 65 Highway. (A.R., Tab 9). The FERC approved the entire 122-mile route, including the Refuge crossing, in an order entered on October 28, 1998. (*Id.*). The FWS was responsible for the issuance of the Permit which allowed SONAT to cross the Refuge at the particular portion of the Tennessee River in question. (A.R., Tab 10).

Plaintiffs CONAPP and Wild Alabama filed their initial complaint with this court on January 19, 1999, along with a Motion for Temporary Restraining Order against the defendant FWS and two of its employees in their official capacity for approving the issuance of a FWS permit to SONAT allowing the construction of a natural gas pipeline across the Refuge. A conference on the plaintiffs' Motion for Temporary Restraining Order resulted in the court

setting a date for a formal hearing treating the TRO pleadings and the responses thereto as a request for a preliminary injunction.

## II. DISCUSSION

Plaintiffs bring their suit pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et. seq., the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-596, 601-612 and 701-706, the National Wildlife Refuge System Administration Act ("NWRSAA"), 16 U.S.C. § 668dd(d)(1)(B), and the Endangered Species Act ("ESA"), 16 U.S.C. §1531 et seq. Plaintiffs challenge the issuance of the permit to directional drill under the Tennessee River on a portion of the Refuge for the purpose of constructing a natural gas pipeline.

Plaintiffs' amended complaint contained three alleged violations. In Count One plaintiffs allege that the FWS violated NEPA by relying on a deficient environmental assessment ("EA") in making its decision to grant the permit instead of producing a full-fledged environmental impact statement ("EIS"). Plaintiffs alleged that the EA is procedurally flawed because it fails to go into sufficient depth concerning (1) the alternatives to SONAT's proposed pipeline crossing; (2) the cumulative impacts from the project; and (3) the site specific features of the areas to be impacted. (Plaintiffs' Motion for TRO at 4). In Count Two of their complaint, plaintiffs allege that the FWS violated NWRSAA when it determined that the permit right-of-way was compatible with Refuge purposes. In Count Three plaintiffs claim that the FWS is violating the ESA because the permitted directional drill operation will threaten the endangered pink mucket mussel.

Plaintiffs sought a preliminary injunction from this court to prevent the Permit from becoming operative. Before granting a preliminary injunction against the FWS, the court must

find that plaintiffs have established: (1) there is a "substantial likelihood" that plaintiffs will prevail on the merits; (2) there is a "substantial threat" of irreparable injury absent injunction; (3) the prospective injury outweighs any threatened harm an injunction would cause to the Government; and (4) the public interest would be served by a preliminary injunction. *Church v. Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994). Because a preliminary injunction is such an extraordinary remedy, the moving party bears the burden of proof on each of these prerequisites. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters Local No. 70, Etc.*, 415 U.S. 423, 441 (1974); *Church*, 30 F.3d at 1342.

### A. Substantial Likelihood That Plaintiffs Will Prevail on the Merits

#### 1. Count One: NEPA

Judicial review of administrative decisions under NEPA is undertaken pursuant to the "arbitrary and capricious" standard of the Administrative Procedure Act, 5 U.S.C. § 706. *See North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1538 (11th Cir. 1990) (adopting "the arbitrary and capricious standard when reviewing agency action in NEPA cases"). The APA additionally sets forth the scope of judicial review limiting any review to the administrative record before the agency at the time of the decision-making. 5 U.S.C. § 706.

To determine "whether an agency's decision was arbitrary and capricious, the reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 1538 (citing *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1989). Courts are not "empowered to substitute their judgment for that of the agency." *Bowman Transp., Inc. v. Ark.-Best Freight Sys.*, Inc., 419 U.S. 281, 285 (1974); *see also Motor Vehicles Mfrs. Ass'n. v. State Farm Mut.*, 463 U.S. 29, 43

(1983). The agency decision "'need not be ideal, so long as it is not arbitrary or capricious, and so long as the agency gave at least minimal consideration to relevant facts contained in the record.'" *Harris v. U.S.*, 19 F.3d 1090, 1096 (5th Cir. 1994) (citing *Motor Vehicles Mfrs. Ass'n.*, 463 U.S. at 43). This high degree of deference is particularly important where, as here, the court is called upon to review determinations involving agencies' technical expertise and scientific judgments. *See Marsh*, 490 U.S. at 375-78.

The Eleventh Circuit has made clear that "the arbitrary and capricious standard gives an appellate court the least latitude in finding grounds for reversal," and that "'administrative decisions should be set aside in this context only for substantial procedural or substantive reasons as mandated by statute, not simply because the court is unhappy with the result reached.'" *Skinner*, 903 F.2d at 1538-39 (citing *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 558 (1978)). Thus, "once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot interject itself within the area of discretion of the executive." *Strykers's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 227 (1979). Therefore, in determining whether the FWS has complied with NEPA here, the court need only satisfy itself that the FWS looked to the relevant factors and exercised its judgment in a manner that is not arbitrary and capricious. *Skinner*, 903 F.2d at 1539; *see also Baltimore Gas & Elec. v. NRDC*, 462 U.S. 87, 103 (1983); *Marsh*, 490 U.S. at 378; *Environmental Coalition of Broward City, Inc. v. Myers*, 831 F.2d 984, 986 (11th Cir. 1987).

On January 25, 1996, SONAT filed an application in docket No. CP96-153-000 under Section 7(c) of the Natural Gas Act with the FERC for authorization to construct the North

Alabama Pipeline. (A.R., Tab 8 at 1-1). That application triggered the NEPA review process and ultimately resulted in the issuance by FERC of a comprehensive EIS ("FERC FEIS") for the pipeline. (A.R., Tab 8). The FERC FEIS examined the environmental impacts (including cumulative and indirect impacts) relating to the entire North Alabama Pipeline. (*Id.*). However, the FERC was not required to shoulder its NEPA review obligations alone. Since completion of the North Alabama Pipeline involved both a crossing of the Refuge and examination of potential project impacts to wetlands and wildlife, FWS formally participated throughout the FERC-NEPA review and in FERC's preparation of the FERC FEIS as a "cooperating agency."[2] (*Id.* at 1-2). The FWS assisted in the evaluation of the project's environmental impacts and in developing the FERC FEIS. (A.R., Tab 8).

      Consistent with its obligations as a cooperating agency under NEPA, FWS reviewed the North Alabama Pipeline's potential impacts, including potential impacts to the Refuge. (*Id.*). FWS consulted with the FERC concerning the environmental consequences and appropriate siting for the North Alabama Pipeline. (*Id.* at 3-21). During the course of those consultations, FWS made clear its preference for the I-65 corridor crossing based on its evaluation of Refuge-related impacts and its policy concerning the issuance of new rights-of-way across the Refuge. (*Id.*). Based upon its analysis of the FERC FEIS and the North Alabama Pipeline, the FERC selected an alternative refuge crossing known as the Triana 2 variation. (*Id.* at 3-26). The FERC's approval was expressly conditioned on FWS granting a right-of-way to cross the Refuge

---

[2] Under the Council on Environmental Quality's regulations for implementing NEPA, the term "cooperating agency" means a federal agency "which has jurisdiction by law or special expertise with respect to any environmental impact involved in" the action under consideration. 40 C.F.R. 1508.5. The purpose for inclusion of cooperating agencies in NEPA review "is to emphasize agency cooperation early in the NEPA process." *Id.* at 1501.6.

at that location. (Defs' Evid. in Opp., Appendix Vol. 1, Tab B, 79 FERC ¶ 61,280, 62,205).

Based on its concerns over impacts to the Refuge associate with the Triana crossing, FWS rejected that route, and reiterated its strong support for the I-65 corridor alternative. (A.R., Tab 9). That rejection prompted SONAT to file an amended permit application with the FERC which, in turn, prompted yet another round of NEPA review (in which FWS again participated as a cooperating agency). (*Id.*). This second round of NEPA review culminated in the FERC's issuance of a Final Supplemental FEIS for the North Alabama Pipeline Project ("FERC FSEIS"). (*Id.*). The principal focus of the FERC FSEIS was the examination of the I-65 Refuge crossing along with the alternative Refuge crossings. (*Id.* at 1-2). FERC subsequently amended the Pipeline Certificate to authorize a route crossing the Refuge at the I-65 corridor. (A.R., Tab 9). Following issuance of the amended Pipeline Certificate and the performance of still further NEPA review by FWS concerning the potential impacts to the Refuge, FWS issued a special use permit authorizing the North Alabama Pipeline to cross the Refuge at the I-65 corridor. (A.R., Tab 10).

As this background makes clear, FWS's EA is not an isolated "first step" in the agency's NEPA evaluation of the North Alabama Pipeline's potential environmental impacts. The FWS's EA challenged in this case is the third round of NEPA review for this particular project.

Most of plaintiffs' criticisms relate to the depth of discussion contained in the EA and their further concern that the FWS has not met its obligations under NEPA by improperly segmenting this project into its smaller component parts. Plaintiffs' Motion for TRO at 7. (claiming that the defendants are "inviting the Court to segment this project into tiny pieces so that the whole project can evade full NEPA review."). "Segmentation' or 'piecemealing' occurs

when an action is divided into component parts, each involving action with less significant environmental effects." *Town of Huntington v. Marsh*, 859 F.2d 1134, 1142 (2d Cir. 1988). It is to be avoided "to insure that interrelated projects, the overall effect of which is environmentally significant, not be fractionalized into smaller, less significant actions" so as to escape NEPA review. *Id.* (citation omitted).

In this case, the entire North Alabama Pipeline has already been the subject of review under NEPA. In fact, the FERC and FWS have now collaborated to prepare three separate sets of environmental documents for the entire project. This collaborative NEPA review has resulted in the preparation of the FERC FEIS and Final Supplement to the FEIS which examine the direct, indirect and cumulative impacts relating to the North Alabama Pipeline (including pipeline impacts within and outside the boundaries of the Refuge), as well as the more focused EA prepared by FWS.

Plaintiffs contend that the EA is deficient because FWS has failed to adequately consider the relevant environmental impacts and system alternatives for the North Alabama Pipeline's proposed Refuge crossing. However, the environmental impacts associated with the North Alabama Pipeline have already been the subject of full scale NEPA reviews in which the FWS fully participated. Accordingly, plaintiffs have failed to show that there is a substantial likelihood that they will prevail on the merits on the NEPA claim contained in Count One.

### 2. Count Two: Refuge Policy

The FWS is authorized by statute to issue rights-of-way across the Refuge when it determines that such rights-of-way are compatible with Refuge purposes. 16 U.S.C. § 668dd(d)(1)(A). Congress did not strictly define "compatibility" in the National Wildlife

Refuge System Administration Act. Rather, the FWS may properly determine that a particular grant of access is compatible within the meaning of 16 U.S.C. § 668dd(d)(1)(A) where "it will not materially interfere with or detract from the purpose for which the refuge was established." *See McGrail & Rowley v. Babbitt*, 986 F. Supp. 1386, 1392 (S.D. Fla. 1997) (quoting the Service Manual). Such determinations by the FWS may be reviewed solely for an abuse of discretion. *Animal Lovers Volunteer Ass'n, Inc. v. Cheney*, 795 F. Supp. 994, 997 (C.D. Cal. 1992).

The FWS's compatibility determination of December 23, 1997, recites a multitude of Refuge purposes, including: "a refuge and breeding grounds for migratory birds and other wildlife," "incidental fish and wildlife-oriented recreational development," "protection of natural resources," and "conservation of endangered species or threatened species." (A.R., Tab 2 at 1). The anticipated impacts from the pipeline are temporary loss of upland and wetland habitats during construction. (*Id.* at 2). These impacts are mitigated by permit stipulations that require directional drilling under the river, recontouring of disturbed lands, and construction activities limited to non-waterfowl season. (*Id.* at 2-3). The compatibility determination found justification for the permit in the near proximity of the Refuge to the urban areas in the Huntsville-Decatur region. (*Id.*).

Plaintiffs are particularly critical of the compatibility determination because the placement of the pipeline falls just outside of the I-65 highway right-of-way and because it does not exactly track existing utility lines. Although the right-of-way ("ROW") grants of the FWS are not necessarily exclusive, in most instances the grant of two or more ROWs in the same physical space would hamper the operations of all and could constitute a violation of the rights secured by the holders of such ROWs. In addition, the purpose of the ROW policy of the Refuge

9

is to gather ROWs together in clusters so that the entire Refuge and its habitat is not fragmented. To accomplish this, it is not necessary to lay one ROW on top of another. The FWS has itself recognized the distinction between "rights-of-way" and refuge crossing corridors, within which it desires to locate rights-of-way when and as appropriate.

The ROW in this case was issued for a location immediately adjacent to Interstate 65 and within the I-65 corridor that has been identified by the FWS as an area already subjected to disturbances. The bed of the Tennessee River is not within the jurisdiction of the FWS or the Refuge. Thus, the compatibility determination and the ROW policy was only indirectly concerned with impacts within the river bed. The impacts reviewed in the compatibility determination concerned the drilling platforms for the directional drilling and some open trenching on upland within the Refuge.

Finally, the exigencies and particular needs of each ROW request preclude a hard and fast rule that ROWs all must be located in the same physical space. The FWS has determined that the new ROW is within the I-65 crossing corridor.

A review of the FWS' compatibility determination and EA reveal that the FSW did not act in an arbitrary or capricious manner. Plaintiffs have failed to establish that there is a substantial likelihood that they will prevail on the merits of the claim contained in Count Two.

### B. Substantial Threat of Irreparable Injury Absent Injunction: All Counts

Plaintiffs presented two witnesses, acknowledged as experts in their fields, in an effort to point out the alleged deficiencies in the record dealing with the potential for mishap in using a directional drill method for crossing under the Tennessee River and the potential impacts a mishap could have on the endangered pink mucket mussels living on the river bed. Those

witnesses were Colin Fairn, an engineer expert in horizontal directional drilling, and Doug Shelton, a marine biologist specializing in the study of mollusks. With the exception of the testimony of these two witnesses and the exhibits introduced at the hearing, the court relied entirely on the administrative record in this case and the oral and written argument of counsel.

Plaintiffs claim that the FWS is violating the ESA because the permitted directional drill operation will threaten the endangered pink mucket mussel. Plaintiffs' witness Fairn testified as to how directional drilling works. He explained that "frac-outs," inadvertent releases of drilling mud, may occur in drilling operations of this kind, and that the released drilling mud could possibly find its way to the bed of the Tennessee River if it found the right combination of fractures and fissures aligned to allow it to percolate upwards from the drill hole. Mr. Fairn did not dispute that the drilling mud, which consists of bentonite clay and water, is non-toxic. Mr. Fairn did not give a probability of the likelihood of this scenario coming to pass nor did he indicate the potential for a particular mussel or group of mussels to be affected by the inadvertent release of drilling mud. The court finds that Mr. Fairn's assertions are too speculative to support a finding of a substantial threat of irreparable injury to plaintiffs.

Plaintiffs' witness Shelton was informative as to the background and habits of this particular mussel species. He noted that if sufficient quantities of drilling muds were directly deposited on top of a particular mussel, it might suffocate and die. However, Mr. Shelton's testimony did not indicate what the impact of the diluting effect of the Tennessee River's current flows might be or the quantity of mud release necessary to kill a mussel or group of mussels. The court finds that Mr. Shelton's assertions are too speculative to support a finding of a substantial threat of irreparable injury to plaintiffs.

Based on the testimony presented and review of the record, plaintiffs have failed to carry their burden of demonstrating the likelihood of irreparable harm on all counts. Plaintiffs' claims of harm are speculative, and do not serve to meet their burden. See *National Wildlife Fed'n v. Burlington Northern R.R.*, 23 F.3d 1508, 1512 n.8 (9th Cir. 1994) (in order to demonstrate likelihood of injury to listed species, plaintiffs must show "a definitive threat of future harm to protected species, not mere speculation").

Plaintiffs' motion for a preliminary injunction fails because plaintiffs cannot meet the rigorous standard necessary to justify such extraordinary relief. Specifically, plaintiffs cannot show (1) a substantial likelihood of prevailing on the merits in Counts One and Two and (2) a substantial threat of irreparable injury absent an injunction in Counts One, Two, and Three. Since plaintiffs failed to meet their burden with respect to these two requirements for a preliminary injunction, the court need not discuss the last two requirements.

### III. CONCLUSION

The court concludes that the plaintiffs' Motion for Preliminary Injunction is due to be denied. An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this 30th day of March, 2000.

*/s/ Sharon Lovelace Blackburn*
**SHARON LOVELACE BLACKBURN**
United States District Judge